**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
WEST PALM BEACH DIVISION

Case No.:_____

WYNDHAM VACATION OWNERSHIP, INC. a
Delaware corporation; WYNDHAM VACATION
RESORTS, INC., a Delaware corporation,
WYNDHAM RESORT DEVELOPMENT
CORPORATION; an Oregon Corporation, and
SHELL VACATIONS, LLC, an Arizona limited
liability company,

       Plaintiffs,

v.

TOTTEN FRANQUI DAVIS & BURK, LLC, a
Florida limited liability company; TOTTEN
FRANQUI DAVIS & BURK, PLLC, a North
Carolina professional limited liability company;
AMERICAN RESOURCE MANAGEMENT
GROUP, LLC d/b/a resortrelease.com d/b/a
americanresourcemanagementgroup.com, a Florida
limited liability company; VACATION
PROPERTIES FOR LESS, LLC, a Florida limited
liability company; REDEMPTION AND RELEASE,
LLC, a Florida limited liability company; RESORT
EXIT TEAM, LLC d/b/a resortexitteam.com, a
Florida limited liability company; JOHN DOE #1
d/b/a myredemptionservices.com; HELPING
TIMESHARE OWNERS, INC. f/k/a HELPING
TIMESHARE OWNERS LLC d/b/a
canceltimesharecontract.com d/b/a Help4TSO, a
Florida corporation; JOHN DOE #2 d/b/a Timeshare
Freedom Group d/b/a timesharefreedomgroup.com;
ERIC S. CLINE a/k/a STEPHEN E. CLINE, an
individual; SHYLA CLINE, an individual; SCOTT
MORSE a/k/a LARRY SCOTT MORSE, an
individual; WILLIAM HOWELL JR., a/k/a William
W. Howell, Jr. a/k/a Bob Howell a/k/a Bill Howell,
an individual; and JORDAN SALKIN, an individual,

       Defendants.

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Wyndham Vacation Ownership, Inc. ("WVO"); Wyndham Vacation Resorts, Inc. ("WVR"); Wyndham Resort Development Corporation ("WRDC"); and Shell Vacations, LLC ("SV") (collectively, "Wyndham"), through counsel and pursuant to the Federal Rules of Civil Procedure, hereby sue Defendants Totten Franqui Davis & Burk, LLC ("TFDB Law FL"); Totten Franqui Davis & Burk, PLLC ("TFDB Law NC") (TFDB Law FL and TFDB Law NC, together, "TFDB Law"); American Resource Management Group, LLC d/b/a resortrelease.com d/b/a americanresourcemanagementgroup.com ("Resort Release"); Vacation Properties for Less, LLC ("Vacation Properties"); Redemption and Release, LLC ("Redemption"); Resort Exit Team, LLC d/b/a resortexitteam.com ("Resort Exit"); John Doe #1 d/b/a myredemptionservices.com ("John Doe"); Helping Timeshare Owners, Inc. f/k/a Helping Timeshare Owners LLC d/b/a canceltimesharecontract.com d/b/a Help4TSO ("Help4TSO"); John Doe #2 d/b/a Timeshare Freedom Group d/b/a timesharefreedomgroup.com ("Timeshare Freedom"); Eric S. Cline a/k/a Stephen E. Cline ("Eric Cline"); Shyla Cline; Scott Morse a/k/a Larry Scott Morse ("Morse"); William Howell Jr. a/k/a William W. Howell, Jr. a/k/a Bob Howell a/k/a Bill Howell ("Howell"); and Jordan Salkin ("Salkin")(collectively, the "Defendants"), and state:

### A. BACKGROUND ON THE TIMESHARE INDUSTRY AND DEFENDANTS' TARGETED AND NEFARIOUS SCHEME

1. Timeshare properties, also known as vacation rentals, revolutionized the vacation and travel industry and have been a popular option for families for decades. Prior to the inception of the timeshare industry in the United States, anyone wanting to vacation in the same destination each year faced the limited options of (a) booking a hotel in advance and paying the daily rate (assuming availability) or (b) purchasing a vacation property (a significant financial investment with ongoing obligations of care, repair, and maintenance).

2.      The birth of the innovative timeshare concept in the 1970s changed the vacation landscape. Now, developers, like Wyndham, can divide a single vacation unit between 52 owners, with each owner purchasing fractional interest of the whole for a specified share of the total price, i.e. deeded ownership.  Developers, like Wyndham, also sell membership interests to consumers in the form of points, which, in turn, are exchanged for use at Wyndham properties. Wyndham owners may also belong to a Wyndham program called 'Club Wyndham Plus', which allows owners to use their ownership at Wyndham resorts to stay at additional properties that Wyndham does not own, further expanding consumer's choices.

3.      This concept has allowed consumers an incredible opportunity to enjoy regular vacations at the fraction of the typical cost and without the burdens associated with undivided vacation property ownership. Moreover, in exchange for payment of a regular maintenance fee, timeshare owners receive assurance of high quality resorts every year, while simultaneously avoiding rising future prices.

4.      Today, the timeshare industry continues to thrive.  As reported by the American Resort Development Association ("ARDA"), "the timeshare industry remains healthy, showing that owners have become increasingly engaged with their timeshares and the timeshare lifestyle, while the industry continues to attract new buyers."  As of 2016, 9.2 million households in America were timeshare owners.

5.      Recently, however, a nefarious cottage industry known as "timeshare exit" has sprouted.  This insidious industry preys upon unsuspecting timeshare owners, inducing them into breaching their binding timeshare contracts, causing both the consumers and timeshare developers, like Wyndham, grave harm.

6.     These timeshare exit businesses typically demand exorbitant up-front payment from consumers, and then do little or nothing on behalf of the consumer, often leaving the consumer with ruined credit.  To make matters worse, many consumers that may have an issue with their timeshare product could have the issue resolved by simply contacting the timeshare developer, such as Wyndham, directly or utilizing one of the many programs created by the timeshare industry for consumers, such as the Wyndham Ovation® program.

7.     Defendants, acting in concert, have engaged in a scam to take advantage of timeshare owners and cause Wyndham, its business, and its established brand millions of dollars in damages.  Defendants maliciously and purposefully act, using incestuous shell companies and websites, as well as lawyers and sham law firms, to divert or to otherwise hide, and abscond with funds from consumers that own Wyndham timeshare products ("Wyndham Owners") and interfere with the current and prospective contractual relationships between Wyndham Owners and Wyndham.

8.     Defendants engage in extensive and prolific false advertising, make untrue statements and misleading empty promises, and guarantee success or specific results that they cannot – and do not – deliver to unsuspecting timeshare owners (including Wyndham Owners), while surreptitiously extracting exorbitant, unwarranted fees for illusory services – fees that otherwise would have been used to pay Plaintiffs for amounts properly owed to them.

9.     Defendants' misdeeds and practices have caused significant financial and reputational damage to Wyndham.  In addition to lost revenues, Wyndham is further damaged by the loss of goodwill to its customer base whom may be required to pay more maintenance and/or annual fees than contemplated due to non-payment by others, and tarnishment of Wyndham's reputation and brand, as well as lost revenue associated with the loss of repeat business, referrals,

and upgrades by existing Wyndham Owners, and the costs, losses, and fees related to the substantial resources utilized and expended to address the results of Defendants' actions.

10.     Wyndham has no other option but to actively and aggressively seek justice for itself, as well as injunctive relief to thwart Defendants from inflicting further and ongoing damage to Wyndham's business and, most importantly, its relationships with Wyndham Owners.

### B.     OVERVIEW OF THE COMPLAINT

11.     In pursuing its legal and equitable remedies here, Wyndham is vindicating its own rights in response to the ongoing damage being done to it by Defendants, which has culminated in millions of dollars of lost revenue. Further, as a concomitant effect, Wyndham is also protecting from further harm the Wyndham Owners, and timeshare owners at large, who have been negatively impacted by Defendants' wrongful conduct, and otherwise positively impacting the timeshare industry.

12.     Wyndham institutes this action to halt the Defendants' misconduct, recoup its damages, preserve its goodwill in its customer base and brand strength, and to deter future improvident conduct against Wyndham and the Wyndham Owners, whose relationships with Wyndham are being decimated as a direct result of Defendants' nefarious and unlawful actions.

### B.   PARTIES, JURISDICTION, AND VENUE

#### a.   The Plaintiffs

13.     Plaintiff Wyndham Vacation Ownership, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

14.     Plaintiff Wyndham Vacation Resorts, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

15.     Plaintiff Wyndham Resort Development Corporation is a corporation organized and existing under the laws of the State of Oregon with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

16.     Plaintiff Shell Vacations LLC is a limited liability company organized and existing under the laws of the state of Arizona with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

### b.  The Defendants

17.     Defendant Totten Franqui Davis & Burk, LLC is a limited liability company organized and existing under the laws of the State of Florida with a principal place of business located at 1451 West Cypress Creek Road, Suite 211, Fort Lauderdale, Florida 33309.  TFDB Law FL is ostensibly a law firm with five principals:

   a.  Paul G. Totten, Esq., admitted to practice in the State of Florida;

   b.  Anthony G. Franqui, Esq., admitted to practice in the states of Florida and Texas;

   c.  Garry T. Davis, Esq., admitted to practice in the states of Florida, Ohio, North Carolina, and Missouri;

   d.  Christopher D. Burk, Esq., admitted to practice in the states of Nevada, California, and Arizona; and

   e.  Erica L. Franqui, Esq., admitted to practice in the State of Florida.

18.     Defendant Totten Franqui Davis & Burk, PLLC is a professional limited liability company organized and existing under the laws of the State of North Carolina with a principal place of business located at 2455 East Sunrise Boulevard, Suite 411, Fort Lauderdale, Florida 33304.  Upon information and belief, TFDB Law NC is ostensibly a law firm with the same five principals as TFDB Law FL, though it has a different principal place of business.

19.     American Resource Management Group, LLC is a limited liability company organized and existing under the laws of the State of Florida with a principal place of business located at 1401 West Cypress Creek Road, Suite 101, Fort Lauderdale, Florida 33309.  American Resource Management Group, LLC also maintains a physical address at 6785 Weaver Road, Suite 1B, Rockford, Illinois 61114.  American Resource Management Group, LLC does business through at least two websites: www.resortrelease.com and www.americanresourcemanagementgroup.com.   There are two managers of Resort Release: Defendants Eric Cline and Shyla Cline.

20.     Defendant Vacation Properties for Less, LLC is a limited liability company organized and existing under the laws of the State of Florida with a principal place of business allegedly located at 1451 West Cypress Creek Road, Suite 316, Fort Lauderdale, Florida 33309. Vacation Properties has two managers: Defendants Scott Morse and Eric Cline; Vacation Properties also has one authorized member, non-party Robbert Gaarlandt.  Morse serves as the Registered Agent for Vacation Properties and lists the Registered Agent Address as 2455 East Sunrise Boulevard, Suite 411, Fort Lauderdale, Florida 33304, an address he shares with Mr. Gaarlandt.

21.     Defendant Redemption and Release, LLC is a limited liability company organized and existing under the laws of the State of Florida with a principal place of business located at

2455 East Sunrise Boulevard, Suite 415, Fort Lauderdale, Florida 33304. Redemption has a single manager: Defendant Larry Morse.

22.     Defendant Resort Exit Team, LLC d/b/a resortexitteam.com is a limited liability company organized and existing under the laws of the State of Florida with a principal place of business ostensibly located at 1007 North Federal Highway, Suite 367, Fort Lauderdale, Florida 33304. However, that address, which is also used as the address for the registered agent, is a UPS Store. Upon information and belief, the actual principal address for Resort Exit is 6785 Weaver Road, Suite 1B, Rockford, Illinois 61114. Resort Exit has two managers: Defendants Morse and Eric Cline a/k/a Stephen E. Cline.

23.     John Doe #1 d/b/a myredemptionservices.com is, upon information and belief, the actual beneficial owner and operator of the website located at the domain <myredemptionservices.com>. The domain name <myredemptionservices.com> is registered behind a privacy shield; therefore, the true identity of the owner of said domain name cannot be determined without the use of the Court's subpoena power. However, upon information and belief, Wyndham believes that this entity is yet another alter-ego for the other Defendants for at least the following reasons:

a.     the 'Terms of Service' for the website located at <myredemptionservices.com> (http://myredemptionservices.com/terms-and-conditions/) states that the Terms of Service are "governed by and in accordance with the laws of 2455 E Sunrise Blvd, Fort Lauderdale, FL 33304, United States", which is the same address as TFDB Law NC, the Vacation Properties Registered Agent (Morse), and the principal address of Redemption;

      b.      the 'Terms of Service' list a contact email address of admin@redemptionandrelease.com, which is the same domain name as that maintained and utilized by Redemption; and

      c.      the webpage displays a logo and a hyperlink to the Rockford (Illinois) Chamber of Commerce in the same manner as the Resort Release websites.

24.    Defendant Helping Timeshare Owners, Inc.[1] f/k/a Helping Timeshare Owners LLC d/b/a canceltimesharecontract.com d/b/a Help4TSO is a corporation organized and existing under the laws of the State of Florida with a principal place of business located at 7800 Southland Boulevard, Suite 200, Orlando, Florida 32809.

25.    Defendant John Doe #2 d/b/a Timeshare Freedom Group d/b/a timesharefreedomgroup.com is the owner and operator of the company that operates through website located at the domain <timesharefreedomgroup.com>.  Timeshare Freedom Group purports to have a principal address located at 23046 Avenida De La Carlota, Suite 600, Laguna Hills, California 92653.  However, the California Secretary of State does not have a record for a 'Timeshare Freedom Group' and the actual corporate identity of the defendant remains unknown at this time, but will be discovered through use of the Court's subpoena power.

---

[1] This is not the first time that Wyndham has had to take action against Defendants Helping Timeshare Owners, Inc. and William Howell, Jr. Indeed, Helping Timeshare Owners, Inc. and William Howell, Jr. have been previously enjoined by the Circuit Court in Orange County, Florida relative to their misdeeds directed to Wyndham. (*Wyndham Vacation Resorts, Inc. v. Orlando Ventures, LLC d/b/a Helping Timeshare Owners, Helping Timeshare Owners, LLC, William Howell, Jr., and Orlando TS Investments, LLC*, Case No. 2013-CA-002405-O).  In order to attempt to circumvent the injunction, which was rather limited, they have simply modified their business to avoid the injunction's mandates.  Instead, they remain brazen and undeterred, thumbing their nose at the Circuit Court as they are now a part of a new and even more elaborate timeshare exit scheme with a myriad of co-conspirators.  For that reason, and for their role in this untoward scheme, their new misconduct has necessitated this legal action against them where Wyndham seeks, among other things, a federal injunction.

26.     Defendant Eric Cline is an individual and resident of the State of Florida, owning property located at 2506 Barcelona Drive, Fort Lauderdale, Florida 33301, and is otherwise *sui juris*.

27.     Defendant Shyla Cline is an individual and resident of the State of Florida, is married to Eric Cline, and owns property located at 2506 Barcelona Drive, Fort Lauderdale, Florida 33301, and is otherwise *sui juris*.

28.     Defendant Scott Morse a/k/a Larry Scott Morse is an individual and resident of the State of Florida, owning property subject to the Florida Homestead Exemption located at 930 NE 16th Avenue, Fort Lauderdale, Florida 33304, and is otherwise *sui juris*.

29.     Defendant William Howell Jr. is an individual and resident of the State of Florida who, upon information and belief, resides in the Orlando, Florida area, and is otherwise *sui juris*.

30.     Defendant Jordan Salkin is an individual and resident of the State of California who, upon information and belief, resides in Irvine, California, and is otherwise *sui juris*.

### c.  Subject Matter Jurisdiction

31.     This Court has subject matter jurisdiction over the claims sounding in the Lanham Act alleged herein pursuant to 28 U.S.C. §§ 1331 and 1338.  This Court has subject matter jurisdiction over the claims sounding in state law alleged herein pursuant to 28 U.S.C. § 1367 as the state law claims are so related to the Lanham Act claims that they form part of the same case or controversy.

### d.  Personal Jurisdiction

32.     This Court has personal jurisdiction over the Defendants for the following reasons:

a.　　over TFDB Law FL, TFDB Law NC, Resort Release, Vacation Properties, Redemption, Resort Exit, and Help4TSO as they are all organizations organized and existing under the laws of the State of Florida with registered offices in the State of Florida;

b.　　over Eric Cline, Shyla Cline, Morse, and Howell as they are all residents of the State of Florida, own real property in the State of Florida, and conduct business in the State of Florida;

c.　　over John Doe #1 and John Doe #2 as they are active, not passive, internet-based operations that do business over the internet by entering into contracts with residents of the State of Florida and/or soliciting residents of the State of Florida and/or otherwise providing their services to Wyndham Owners vacationing in the State of Florida through their websites, which involves the repeated transmission of computer files over the internet and allows Florida residents and Florida visitors to exchange their contact information with a host computer; the Court's exercise of personal jurisdiction over John Doe #1 and John Doe #2 will not violate traditional notions of fair play and substantial justice; and

d.　　over Salkin because he is the owner of the domain name through which John Doe #1 operates and is therefore subject to personal jurisdiction in this Court for the same reasons as John Doe #1.

e.　　**Venue**

33.　　Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §1391 because, as described herein, a substantial part of the events giving rise to Plaintiffs' claims

occurred in Florida, the vast majority of the Defendants are located in this District, and Defendants' conduct giving rise to the claims set forth herein occurred in this District

### f. Conditions Precedent, Attorneys' Fees

34.     All conditions precedent to the bringing and maintenance of this action have been performed, were waived, would be futile if attempted, or have otherwise been satisfied or occurred.

35.     Wyndham has retained the services of the undersigned lawyers to represent it in this matter and have obligated themselves to pay reasonable attorneys' fees, which fees are recoverable against Defendants pursuant to 35 U.S.C. § 1117 and other statutes, as set forth in greater detail herein.

### C. NATURE OF THE ACTION

36.     This Complaint requests damages and injunctive relief for violation of the Lanham Act 15 U.S.C. § 1125(a)(1) prohibiting misleading and false advertising, Intentional Interference with Contractual Relations, Intentional Interference with Advantageous Business Relationships/Prospective Economic Advantage, Civil Conspiracy, violation of the Florida Deceptive and Unfair Trade Practices Act, and violation of the Florida Vacation and Plan and Timesharing Act, amongst other causes of action.

### D. THE WYNDHAM ENTITIES

37.     Wyndham is a global leader in the hospitality and vacation ownership industry with properties and a network spanning the world.

38.     Wyndham Vacation Ownership, Inc. is the parent company or ultimate parent company of three entities that conduct timeshare sales and development activities throughout the

United States: Wyndham Vacation Resorts, Inc., Wyndham Resort Development Corporation, and Shell Vacations LLC.

39.     Wyndham devotes substantial resources to advertising and other marketing promotions in an effort to maintain and enhance the value of their established and famous brands.

40.     As part of its business, WVR, WRDC and SV enter into timeshare contracts with consumers (e.g., the Wyndham Owners).  At the time owners purchase timeshares from WVR, WRDC, and/or SV, the owners execute Contracts for Purchase and Sale wherein the owners agree to pay an amount certain for the timeshare interest, as well as maintenance and/or annual fees to the Plaintiffs for the upkeep of the timeshare units and common areas of the timeshare properties. In addition, the owners agree to pay a pro-rated share of the property taxes to Plaintiffs which is then submitted by Plaintiffs to the appropriate local tax collectors.   Often, if a purchaser desires mortgage financing, he or she may apply for a mortgage, and after approval, may execute a Promissory Note and Mortgage, which are referenced and incorporated in the Purchase Agreement.   These timeshare contracts are legally binding contracts and, after the passage of a statutory rescission period, cannot be unilaterally rescinded.

41.     Wyndham Hotels and Resorts, LLC ("WHR", f/k/a Wyndham Hotels and Resorts, LLC and formerly a sister company to WVO), owns, maintains and manages a portfolio of Wyndham related intellectual property.  These intellectual property assets are utilized to market the Wyndham brand.  Wyndham devotes significant resources to advertising and other marketing promotions to maintain and enhance the value of its brands.  Wyndham has made and continues to make ongoing financial investments in the development and improvement of its products and services, and, further invests resources to preserve and enhance its brand value and the goodwill

associated with its products and services.  Indeed, visibility and recognition of its brand products and services is a key component to Wyndham's business model.  Wyndham competes directly with other marketers of resort products who share a similar consumer base.

### E.  THE THIRD PARTY EXIT COMPANY ("TPE") SCAM

42.     Following the late 2007 recession, a small group of individuals hatched a plan to unscrupulously prey on timeshare owners affected by the economic downtown.  These individuals seek economic gain at the expense of timeshare owners and timeshare developers, like Wyndham.  Developers, such as Wyndham, are specifically targeted due to their size, the sheer number of Wyndham Owners, and number of Wyndham branded and managed properties throughout the U.S. and abroad.

43.     These individuals, working together, have formed a relatively new underground sub-industry dubbed "third party exit companies" or "TPEs", "PPEs", or "affiliates".

44.     These various individuals and their TPEs, saw an opportunity to make fast cash from those suffering from the aftermath of the late 2007 recession and without the means to make regular timeshare payments.

45.     Although there are variations of the TPE scam, the TPEs (often owned and managed by unsavory individuals) offer and allegedly provide timeshare interest "transfer" and/or "exit" (i.e. termination of existing contracts) services with respect to consumer resale of timeshare interests in timeshare properties.

46.     Through various forms of deceptive advertising, including, without limitation, direct mailings and other communications crossing state lines, "data mining" on the internet, as well as inappropriate, unsolicited, direct contact with a timeshare developer's owners, TPEs and/or their marketing firms make false statements about developers and/or the timeshare

owners' timeshare interests, provide misleading information to timeshare owners, and otherwise instruct owners to breach their contracts and stop payments on their timeshare agreements and/or maintenance fees, many times through creative "talking points" luring these individuals to act through a "pitch."

47.     These TPEs often charge consumers exorbitant upfront fees while failing to disclose to consumers what, exactly, the timeshare exit company will do for the consumer.  In fact, TPEs frequently mislead consumers, either through blatantly false statements, or statements that, while potentially literally true, are misleading or only partially true.  For example, timeshare exit companies frequently state or imply that they have some sort of 'method' or 'special method' to assist consumers in 'exiting' their timeshare contracts.  TPEs also frequently state or imply that consumers need to retain them because of their 'method' and that it will provide consumers with an advantage of some type in attempting to cancel their timeshare contracts. More specific examples of Defendants' false and/or misleading statements are detailed herein. In reality, these TPEs have no method of helping consumers exit their timeshare contracts as no such method exists separate and apart from any program a timeshare company may choose to offer direct to consumers.

48.     What these companies frequently do is fail to disclose to the consumers that they will, in fact, do very little, if anything, for the consumer and frequently force the consumer's timeshare interest into default and eventually foreclosure, after which the TPE claims that it helped the consumer "exit" their timeshare contract.  Frequently, the consumer is not aware that their timeshare interest was actually foreclosed and their credit rating adversely impacted.  In sum, consumers are persuaded to pay TPEs for illusory services.

49.     Another frequent variation of the TPE scheme is to fraudulently transfer a customer's timeshare interest via quitclaim deed, or other instrument that has not been approved by the timeshare developer, to a third-party or strawman buyer who then fails to make payments on the timeshare interest as required.   Because the transfer was not approved, the resort developer looks to the original owner of the timeshare interest for payment while the original owner is completely unaware that they are still the legal owner of their timeshare interest.

50.     For illustrative purposes, a common form of the TPE scheme works as follows. The timeshare exit company solicits timeshare owners, promising that the timeshare exit company can help the timeshare owner 'effectively' or 'legally' exit their timeshare contract. The timeshare exit company extracts an up-front payment (sometimes financed over time by the timeshare exit company itself) from the consumer.   The timeshare exit company then uses an attorney to send a demand letter to the timeshare company – this attorney is retained directly by the timeshare exit company, *not* the consumer, but purports to represent the consumer.   The demand letters usually state that the consumer wishes to cancel their timeshare, sometimes cite to irrelevant legal decisions, and tell the timeshare developer not to contact the consumer. Sometimes the demand letters reference the Fair Debt Collection Practices Act to further prevent any communication from the timeshare developer to the timeshare owner.   Simultaneously, the timeshare exit company directs the timeshare owner not to speak to the timeshare developer, make no further payments on any outstanding loans and/or not to pay maintenance fees.   Thus, the timeshare exit company has prevented the timeshare developer and timeshare owner from communicating with each other while directing the timeshare owner to take actions that will result in the timeshare owner defaulting on their timeshare contract and, eventually, a foreclosure

of that interest.  After the foreclosure, the timeshare exit company will claim it helped the consumer 'exit' their timeshare contract.

51.     In sum, these TPEs charge timeshare owners exorbitant fees under the auspices that they will get them out of their timeshare contracts, but the services are illusory.  They usually target large timeshare developers, like Wyndham, using unsuspecting timeshare owners as a vehicle to damage Wyndham.

52.     Ultimately, not only is the developer's relationship with its owners irreparably damaged, through the loss of goodwill and brand damage, but these developers are dramatically financially impacted by the loss of millions of dollars.  As for the timeshare owners, they may face the loss of the monies paid, the loss of their timeshare interests through foreclosure, and/or significant negative impact on their credit, amongst other things.  This odious misconduct has been historically insulated from attack, using shell companies or other similar scams.  In many instances, once the TPE is shutdown via court intervention, a "new" TPE with the same principals is created and put in action.

53.     Over the past decade, these TPE scams have refined their trade and the sub-industry has reached new heights and new level of damages.

54.     TPE scams exist for the sole and improper purpose of inducing consumers, including, without limitation, Wyndham Owners, to breach their valid, binding timeshare agreements with Wyndham, thereby defrauding and harming the consuming public, including, without limitation, Wyndham Owners.

55.     Defendants are one such TPE scam, as set forth in greater detail herein.  For ease of reference going forward in this Complaint, an Organizational Chart showing the inter-relationship amongst the Defendants is annexed hereto as Exhibit 1.

### F. TOTTEN FRANQUI – A PURPORTED 'LAW FIRM'

#### a. An Immaculate Conception – A Nefarious Idea is Born

56.     This particular TPE scam was uncovered due to the TFDB Firms – TFDB Law FL and TFDB Law NC, purported law firms.

57.     TFDB Law FL and TFDB Law NC are, ostensibly, law firms formed by five lawyers: Paul Totten, Esq., Anthony Franqui, Esq., Erica Franqui, Esq., Garry Davis, Esq., and Christopher Burk, Esq.

58.     These five lawyers have a long personal history and know each other as follows:

a.     Paul Totten, Esq. and Anthony Franqui, Esq. both went to the St. Thomas University School of Law, graduating in 2001.  They then proceeded to work at the law firm of Hightower & Partners for nearly ten years before forming their own firm, Franqui Totten, LLP.

b.     Erica Franqui, Esq. is married to Anthony Franqui, Esq. and attended St. Thomas University School of Law with Anthony Franqui, Esq. and Paul Totten, Esq.  Erica Franqui, Esq. and Anthony Franqui, Esq. also attended Florida International University together for undergraduate studies.  Erica Franqui, Esq. is allegedly the managing partner at Franqui Totten, LLP.

c.     Garry Davis, Esq. and Christopher Burk, Esq. both went to the Thomas Jefferson School of Law, graduating in 2004.

d.     Garry Davis, Esq. worked at Hightower & Pozo P.A. n/k/a Hightower & Partners from approximately 2004 through approximately May 2006. Garry Davis, Esq. therefore worked with Paul Totten, Esq. and Anthony

Franqui, Esq. at the same firm in the mid-2000s and knew Christopher Burk, Esq. from their time in law school together.

e.      All five have known each other since at least 2008 and most likely earlier.

59.      TFDB Law FL was formed on June 27, 2017.  A copy of the relevant record from the Florida Secretary of State is annexed hereto as Exhibit 2.

60.      TFDB Law NC was formed on August 25, 2017.  A copy of the relevant record from the North Carolina Secretary of State is annexed hereto as Exhibit 3.

61.      Upon information and belief, none of the five lawyers – Totten, A. Franqui, E. Franqui, Davis, or Burk – had ever practiced law in the field of the timeshare industry prior to June 2017.  Totten, A. Franqui, E. Franqui, and Davis had practiced primarily insurance defense law while Burk practiced primarily personal injury.

62.      Yet, for reasons that will be described in greater detail here, these five lawyers from different corners of the country (Totten, A. Franqui and E. Franqui live in South Florida, Davis resides in Ohio, and Burk resides in Nevada) mysteriously and suddenly decide to open a new firm in Fort Lauderdale, Florida practicing an area of law – timeshare – that none of them had ever practiced before.

63.      These five lawyers were oddly successful at their new endeavor.  Less than three months after forming their new law firm, WVR began receiving demand letters from TFDB Law FL and TFDB Law NC.  The demand letters were formulaic and lacked individualized factual and legal analysis.  Their unlawful scam took flight quickly.

64.      From September 9, 2017 through July 30, 2018, WVR alone, a single developer, received approximately 202 such demand form letters from TFDB Law FL and TFDB Law NC. A sampling of these form demand letters is attached hereto as Composite Exhibit 4.

           **b.**  **Something Smells Rotten – TFDB Law's Massive Clientele with No Effort and its Unscrupulous Lawyers' Open and Notorious Ethical Violations**

65.      TFDB Law FL and TFDB Law NC's legitimacy is belied by the facts and their sudden volume of clients is explainable only by their being fed by TPEs.

66.      Somehow, this group of five lawyers from across the country formed a new law firm and immediately found clients in an area of law none of them had ever practiced.

67.      Moreover, they did so without employing any obvious advertising in their own name. The website utilized by both TFDB Law FL and TFDB Law NC utilizes no advertising in their own name, is linked to by only one other webpage, has purchased no Google AdWords® or other similar advertising, and appears to undertake no other advertising activity whatsoever. Their website – www.tfdblaw.com – receives so little traffic it is not measured by popular web-analytics tools.

68.      Yet, with a complete lack of advertising in their own name, TFDB Law FL and TFDB Law NC somehow managed to obtain at least 200 new clients related to Wyndham alone in less than a year, plus untold numbers of clients who are customers of other timeshare developers.

69.      TFDB Law FL and TFDB Law NC engage in other odd behaviors as well. For example, TFDB Law FL and TFDB Law NC usually send 'Limited Powers of Attorney' to Wyndham together with demand letters.

70.      Reviewing these Limited Powers of Attorney shows that TFDB Law FL and TFDB Law NC claim to represent individuals from at least 30 states: Texas, California, Pennsylvania, Maryland, Alabama, Ohio, Michigan, Iowa, Missouri, Nebraska, Idaho, Illinois, New York, Tennessee, Kentucky, Delaware, Washington, Arkansas, Oklahoma, Minnesota, Louisiana, North Dakota, North Carolina, South Dakota, New Jersey, Oregon, Kansas, South

Carolina, Massachusetts, and Colorado, and two provinces of Canada: British Columbia and Alberta.  Thus, according to TFDB Law FL and TFDB Law NC, without using any obvious advertising in their own name, and with no prior experience in the timeshare industry, they managed to convince over 200 Wyndham Owners to retain them from 30 states and two Canadian provinces, yet *none* of these individuals were from the state where TFDB Law FL and TFDB Law NC are based – Florida.

71.     Stranger still is the fact that, despite sending over 200 demand letters to Wyndham, TFDB Law FL and TFDB Law NC have filed only three total lawsuits against WVR, two of which were only filed on the day an applicable statute of limitations would have expired.

72.     Further, while the website for TFDB Law FL and TFDB Law NC state that the firms practice "bodily/personal injury law", "regulatory and compliance defense", and "general corporate law", upon information and belief, and after reviewing Florida litigation records, neither TFDB Law FL nor TFDB Law NC have been involved in any publicly filed cases involving anything other than timeshare law.  Rather, when a non-timeshare case appears, the lawyers of TFDB Law FL and TFDB Law NC handle those cases under their old firm names. For example:

a.     *Nearbrook Capital, LLC v. Nosal Funding, LLC*, Case No. 2018-004531-CA-01, Pending in the Circuit Court for the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida, which was filed by Anthony Franqui, Esq. and Paul Totten, Esq. under the signature block of Franqui Totten, LLP and utilizing their Franqui Totten – not their TFDB Law – emails: Tony@ftlawgroup.com and Paul@ftlawgroup.com;

b. *Unimed International Inc. v. Dermagist, Inc. et al.*, Case No.: 9:18-cv-80148-MIDDLEBROOKS/BRANNON, Pending in the United States District Court for the Southern District of Florida, which was filed by Anthony Franqui, Esq. (as local counsel) under the signature block of Franqui Totten, LLP and utilizing his Franqui Totten – not his TFDB Law – email: tony@ftlawgroup.com; and

c. *Jagolinzer v. Martinez de Castro et al.*, Case No.: 2018-005816-CA-01, Pending in the Circuit Court for the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida, in which Paul Totten, Esq. appeared under the signature block of Franqui Totten, LLP and utilizing his Franqui Totten – not his TFDB Law – email: Paul@ftlawgroup.com.

73. Indeed, the TFDB Law lawyers have been openly dishonest with their respective state bar associations regarding their legal practices as follows:

a. Paul Totten, Esq. reported to the Florida Bar that he was a partner at TFDB Law (*see* Exhibit 5 hereto), yet he is still a partner at Franqui Totten, LLP and appears in lawsuits on behalf of Franqui Totten, LLP;

b. Anthony Franqui, Esq. reported to the Florida Bar that he is a partner at Franqui Totten, LLP (*see* Exhibit 6 hereto), yet he has appeared in lawsuits as an attorney of TFDB Law FL and claims to be a partner in TFDB Law FL and TFDB Law NC;

c. Erica Franqui, Esq. purports to be the managing partner of Franqui Totten, LLP and reported to the Florida Bar that she is a partner at Franqui Totten,

LLP (*see* Exhibit 7 hereto), yet, she claims to be a partner in TFDB Law

FL and TFDB Law NC; and

d.     Christopher Burk, Esq. is listed as a partner in TFDB Law FL and TFDB

Law NC, yet he reports to the Nevada Bar that he is a partner in a firm

named Ayon Burk Injury Law (*see* Exhibit 8 hereto) and purports to be the

owner of The Patriot Law Firm Corp. (*see* Exhibit 9 hereto).

74.     Upon information and belief, the foregoing misrepresentation and obfuscation of

which firm any of these five lawyers actually works for constitutes violations of the rules and

regulations of numerous state bar associations, including, without limitation, the Florida Bar.

## G.   <u>UNRAVELING THE MYSTERY – THE TFDB 'FIRMS' ARE REALLY TPE FRONTS</u>

75.     The mystery of how TFDB Law could obtain so many clients so quickly utilizing

no advertising in its own name and with no experience in this particularized field of law quickly

unraveled once it was discovered that TFDB Law is nothing but a front for a much larger TPE

scam.  Put a different way, TFDB Law was formed either primarily or solely to act as the puppet

'law firm' of a much larger TPE ring.

76.     Other than the oddity of the ability of a firm conducting no advertising in its own

name and possessing no relevant experience in the field to obtain hundreds or thousands of

clients in less than a year, there are two critical mistakes that the Defendants made that gave

away their scam:

a.     TFDB Law and Resort Release share at least one, and more likely

multiple, employees.  Mr. German Beard maintains a LinkedIn profile

where he lists his employment as "Law Clerk/Contract Auditor at Resort

Release/Totten Franqui Davis & Burk, LLC".  A copy of Mr. Beard's

LinkedIn profile is annexed hereto as Exhibit 10.  Mr. Beard is listed as a 'law clerk' on the Resort Release webpage, a copy of which is annexed hereto as Exhibit 11; and

b.  TFDB Law NC listed its principal address as 2455 East Sunrise Boulevard, Suite 411, Fort Lauderdale, Florida 33304, *see* Exhibit 3 hereto.  This is the same address utilized by Vacation Properties and Morse, and is in the same building on the same floor and next to Redemption (Suite 411 compared to Suite 415).

77.  Therefore, and further upon information and belief, the TFDB Law firms are related to, receiving client referrals from, are working on behalf of, and/or being actively controlled by Resort Release and its related persons and companies (as further described hereinbelow).  It so follows that these Defendants are splitting fees.

78.  Such an arrangement is not only illegal, but violates a number of state bar association rules, including, without limitation, Florida Bar Rule Number 4-7.22, prohibiting the splitting of fees with an entity other than a law firm.

**H.  THE WEB OF DECEIT – THE RESORT RELEASE RING**

**a.  The Originating Culprits: Resort Release and American Resource Management Group**

79.  While Resort Release is, itself, only a single entity, it is interrelated with the other defendants to form a wide-reaching scam intended to defraud timeshare owners, including, without limitation, Wyndham Owners, and to cause severe damage specifically to Wyndham, one of its primary targets.

80.  Resort Release maintains a website at www.resortrelease.com.  *See* Exhibit 11.

81.  The Resort Release webpage lists two addresses:

      a.      6785 Weaver Road #1b[sic], Rockford, Illinois 61114; and

      b.      1401 W Cypress Creek Road, Suite 101, Fort Lauderdale, FL 33309 – the building next to the TFDB Law FL offices.

82.      1401 W Cypress Creek Road, Suite 101, Fort Lauderdale, FL 33309 is the address listed with the Florida Secretary of State as the principal and mailing addresses for American Resource Management Group LLC.  A copy of the relevant record is annexed hereto as Exhibit 12.  Eric Cline and Shyla Cline are listed as the two managers of American Resource Management Group LLC.

83.      There is a webpage located at the domain <americanresourcemanagementgroup.com>, a copy of which is annexed hereto as Exhibit 13.  That webpage lists 6785 Weaver Road #1b[sic], Rockford, Illinois 61114 as its address, the same address listed at www.resortrelease.com.

84.      Thus, Resort Release directly runs and operates at least two websites: www.resortrelease.com and www.americanresourcemanagementgroup.com.  Both of these websites clearly demonstrate they engage in TPE activities.

85.      According to the resortrelease.com website:

      a.      Shayla Cline is the Chief Executive Officer and Founder of Resort Release;

      b.      Eric Cline is the President and Co-Founder of Resort Release; and

      c.      Scott Morse is the Chief Operation Officer of Resort Release (*see* Exhibit 11).

**b.  Backlinking  – The Scam Grows in a Shell Game Now Uncovered -
Resort Relief**

86.     The TPE scheme is much larger than just the TFDB Law firm and
www.resortrelease.com.  There are numerous other entities that feed customer leads – including
leads for Wyndham Owners – into the Resort Release scam.

87.     Tools exist that allow users to uncover the various webpages that link to a
particular domain name.  For example, linking to a particular page is known as 'backlinking'
while each link back to one web page from another web page is known as a 'linkback'.

88.     There are many potential uses for linkbacks.  For the Defendants, there are clearly
two main objectives:

      a.     first, linkbacks are one of the methods various search engines, such as
            google.com and bing.com, use to rank a page and determine how close to
            the top of a list of search results that page will appear; and

      b.     second, linkbacks can show how one web page interacts with, and
            transmits data to, a second webpage.

89.     There are at least 938 discreet internet links that have or presently do backlink
directly to the <resortrelease.com> domain name.  A list of these linkbacks is annexed hereto as
Exhibit 14.

90.     Of the known linkbacks to www.resortrelease.com, the following domain names
each host a large number of the linkbacks:

      a.     <americanresourcemanagementgroup.com> (one of the websites directly
            operated by Resort Release as set forth above) – 26 total linkbacks;

      b.     <canceltimesharecontract.com> – 88 total linkbacks;

      c.     <resortexitteam.com> – 364 total linkbacks; and

      d.        <redemptionrelease.com> and <redemptionrelease.ca> (the Canadian website version of redemptionrelease.com) – 361 total combined linkbacks.

      **c.**   **canceltimesharecontract.com**

91.    www.canceltimesharecontract.com hosts a website owned and operated by Defendant Helping Timeshare Owners, Inc. f/k/a Helping Timeshare Owners LLC d/b/a canceltimesharecontract.com d/b/a Help4TSO.  A copy of this website is annexed hereto as Exhibit 15.

92.    A copy of the 'About Us' page located at www.canceltimesharecontract.com/about-us/ is annexed hereto as Exhibit 16.  That page states that Help4TSO was founded by Defendant Bob Howell a/k/a William Howell Jr.  *Id.*

93.    A copy of the Florida Secretary of State records for Help4TSO is annexed hereto as Exhibit 17.  Defendant Howell is the Registered Agent, President, and sole Officer of Help4TSO.

94.    The linkbacks from Help4TSO to Resort Release all point users to two different areas:

      a.      first, and least common, the linkbacks direct consumers directly to content hosted at www.resortrelease.com; and

      b.      second, and far more common (comprising the bulk of the Help4TSO linkbacks as shown on Exhibit 14), the linkbacks cause information entered on the canceltimesharecontract.com website to be captured and sent directly to Resort Release.

95.    The capturing and transmission of information from canceltimesharecontract.com to Resort Release works in the following way.  On many (if not all) of the individual webpages located at canceltimesharecontract.com is a box or series of boxes, together with a clickable button, that prompt users to enter their contact information to receive a free consultation or other services.    However, when a user enters information and clicks on the clickable button, unbeknownst    to    the    user,    the    information    entered    is    not    transferred    to canceltimesharecontract.com or Help4TSO, it is, instead, transferred to a program running on e.resortrelease.com.  A copy of webpage source code from canceltimesharecontract.com showing one example of this behavior is annexed hereto as Exhibit 18.[2]   The program running at e.resortrelease.com is a program named Mautic.  A copy of the website a web browser is directed to when attempting to access e.resortrelease.com is annexed hereto as Exhibit 19.  "Mautic provides free and open source marketing automation software available to everyone.  Free email marketing software, lead management software and more."[3]

96.    Thus, when a user clicks on many of the buttons and other items located at canceltimesharecontract.com, instead of sending their information to Help4TSO, that user's

---

[2]    In    summary,    the    source    code    annexed    hereto    as    Exhibit    18    is    for    a    webpage    hosted    at <canceltimesharecontract.com> and works as follows.  Defendants, or their associates and/or agents, have created a fake Google+ account for a 'Sheryl Sanders' located at https://plus.google.com/u/0/106509450961115249791.  The account is clearly fake as the profile picture for 'Sheryl Sanders' is actually a 'stock' photograph titled "Portrait [sic]happy mature woman looking at camera", available at https://www.123rf.com/photo_12465982_portrait-happy-mature-woman-looking-at-camera.html?fromid=TEVCWUFkQTZHT3JSV0tDNHNnUDc2QT09.  A link on the fake Google+ page for 'Sheryl Sanders' directs consumers to a landing page at canceltimesharecontract.com.  The landing page at canceltimesharecontract.com runs the code annexed hereto as Exhibit 18.  Webpage source code can cause many things to occur without a user's knowledge; for example, when a set of pre-determined conditions are met, such as time spent on page or a user moving their mouse towards the top of their web browser to navigate away from the page, code may cause a box (known as a 'lightbox') to 'pop-up' on the user's screen prompting them to complete information and click a 'submit' button.  The code annexed hereto as Exhibit 18 causes a lightbox to appear when a user moves their mouse to the top of their web browser as if to navigate away from Defendants' website, and prompts users to cancel their Wyndham timeshare and sends the information entered to a subdirectory located at e.resortrelease.com.  This is only one example of such code running on Defendants' various websites, the websites are littered with such code to such an extent that including all such code within this Complaint is impractical.

[3] http://www.mautic.com (last accessed Aug. 6, 2018).

- 28 -

information is instead sent directly to Resort Release and Resort Release's customer relationship management software (i.e., Mautic).

97.     This behavior is purposefully secreted and never disclosed to consumers.

### d.  resortexitteam.com

98.     resortexitteam.com        works        in        a        near        identical        fashion        to canceltimesharecontract.com.

99.     www.resortexitteam.com hosts a website owned and operated by Defendant Resort Exit.  Resort Exit has two managers: Defendants Morse and Eric S. Cline a/k/a Stephen E. Cline (switching his middle and first names).  A copy of the website is annexed hereto as Exhibit 20.  A copy of the Florida Secretary of State records for Resort Exit is annexed hereto as Exhibit 21.

100.     Just like Help4TSO, Resort Exit uses a number of backlinks (in this case, hundreds of them) to capture consumer information and transmit it, without the consumer's knowledge, directly to Resort Release.  A copy of webpage source code from resortexitteam.com showing one example of this behavior is annexed hereto as Exhibit 22.

101.     Additionally, Resort Exit uses the same Rockford, Illinois address as Resort Release, resortrelease.com, and americanresourcemanagementgroup.com, and utilizes the same picture of the founders of the company as Resort Release, also stating that Resort Exit was established on January 22, 2012, the same date as Resort Release.

### e.  redemptionrelease.com,             redemptionrelease.ca,             and myredemptionservices.com

102.     redemptionrelease.com, and its Canadian directed version redemptionrelease.ca, not unsurprisingly, work in near identical fashion to canceltimesharecontract.com and resortexitteam.com.

103.    Both redemptionrelease.com and redemptionrelease.ca host websites owned and operated by Defendant Redemption and Release, LLC.  Copies of these websites are annexed hereto as Exhibits 23 and 24, respectively.  A copy of the Florida Secretary of State records for Redemption is annexed hereto as Exhibit 25.  Redemption has a single manager: Defendant Morse.

104.    Just like Help4TSO and Resort Exit, Redemption uses a number of backlinks (in this case, hundreds of them) to capture consumer information and transmit it, without the consumer's knowledge, directly to Resort Release.  A copy of webpage source code from redemptionrelease.com showing one example of this behavior is annexed hereto as Exhibit 26.

105.    redemptionrelease.com contains a link to view the 'Terms and Conditions' of the website.  When a user clicks on that link they are directed to myredemptionservices.com/terms-and-conditions.  The website located at myredemptionservices.com also engages in the backlinking activity described hereinabove (*see* Exhibit 14) and, as described hereinabove, is likely yet another alter-ego of the Defendants.

### f.   vacationpropertiesforless.com

106.    This domain name is yet another alter-ego of Defendants.

107.    www.vacationpropertiesforless.com hosts a website owned and operated by Defendant Vacation Properties for Less, LLC.  Vacation Properties has two managers: Defendants Morse and Eric Cline and a single authorized member, non-party Robbert Gaarlandt.[4]  A copy of the website is annexed hereto as Exhibit 27.  A copy of the Florida Secretary of State records for Vacation Properties is annexed hereto as Exhibit 28.

---

[4] Robbert Gaarlandt is a known associate and partner of Robert Sussman, one of the two individuals running U.S. Consumer Attorneys, another TPE scam and a current defendant in a matter pending in the Southern District of Florida (Fort Pierce Division), *Diamond Resorts International, Inc., et al v. US Consumer Attorneys, P.A., Henry Portner, Esq., and Robert Sussman*; Case No. 9:18-cv-80311-ROSENBERG/REINHART.

108.    Vacation Rentals purports to be a licensed real estate brokerage firm that specializes in timeshares.  Upon information and belief, Vacation Properties works in concert with the other Defendants to attempt to dispose of timeshare units owned by the consuming public, including, without limitation, Wyndham Owners.

109.    More specifically, upon information and belief, Defendants utilize Vacation Properties to absorb timeshare units the Defendants are unable to dispense with in any other fashion and, additionally, select timeshare interest the Defendants wish to own and operate themselves.

110.    Additionally, upon information and belief, Vacation Properties is engaged in the same improper, illegal sharing of consumer data set forth hereinabove with respect to its co-defendants.

### I.  TRYING TO HIDE BY MAKING THE SCAM UNWIELDLY – THE RELATED PATRIOT RING

111.    The Resort Release ring is not the only TPE scam TFDB Law is involved with. There is also the Patriot ring.

112.    In addition to allegedly being a partner in TFDB Law, and being a partner in Ayon Burk, Christopher Burk, Esq. is also allegedly the sole owner and operator of The Patriot Law Firm, Inc. in Nevada.

113.    The Patriot Law Firm maintains a website at www.fightforthelittleguy.com.  Prior to the summer of 2018, www.fightforthelittleguy.com displayed a webpage simply for Christopher Burk, Esq.  The webpage was then mysteriously changed to The Patriot Law Firm, with an address located in a Regus shared office space in Las Vegas, Nevada.  Upon information and belief The Patriot Law Firm is yet another TPE front maintained by Burk as it is the third

'law firm' in which Burk, individually, is a partner, it was only formed recently, it does not appear to engage in any outward activities, and utilizes a shared office space separate and apart from Burk's other firms – TFDB Law and Ayon Burk.

114.    There is, not coincidentally, another 'Patriot Law' in Nevada.  Patriot Law Group, which maintains a webpage located at www.patriotlawgroup.com, claims an address located at 297 Kingsbury Grade, Lake Tahoe, Nevada 89449.  As with Burk's The Patriot Law Firm, 297 Kingsbury Grade, Lake Tahoe is a shared office space.

115.    The Patriot Law Group website, a copy of which is annexed hereto as Exhibit 29, is clearly a front as it is incomplete.

116.    The Patriot Law Group lists its phone number of 866-668-6872.

117.    That same phone number is utilized by John Doe #2 d/b/a Timeshare Freedom Group d/b/a timesharefreedomgroup.com.  A copy of the timesharefreedomgroup.com website, showing the 866-668-6872 phone number, is annexed hereto as Exhibit 30.

118.    Timeshare Freedom is yet another TPE company with offices in various locations. One of its locations is in Phoenix, Arizona at 2375 East Camelback Road, Suite 600.  One of Burk's law firms – Ayon Burk – maintains an office across the street from Timeshare Freedom, at 2415 East Camelback Road, Suite 700, Phoenix, Arizona 85016.  Prior to Burk joining what was previously known as the Ayon Law Firm, Ayon Law did not have an Arizona office.  The Arizona office of Ayon Burk, which is once again located in a Regus shared office space, only appeared with Burk's joining the firm.

119.    Timeshare Freedom's domain name is owned by Salkin.  A copy of the relevant WHOIS record is annexed hereto as Exhibit 31.

120.    Salkin alleges he is a call center consultant that previously worked at Aston Marketing Group ("AMG").  AMG is a well-known TPE and backed by the notorious husband and wife team of David McMillan and Cynthia Barrett Martin (together, the "McMillins"), one of the originators of the TPE model.  True to form, the McMillans' scheme involved the fraudulent solicitation of Wyndham timeshare owners, whom were enticed through the McMillans' fraudulent business practices, including, without limitation, charging upfront fees to Wyndham timeshare owners to allegedly facilitate the sale of those interests (supposedly relieving the owners of post-sale maintenance fees and/or debt obligations associated with their timeshare interests), as well as other fraud in the form of mail fraud and submission of fraudulent warranty deeds and closing documents to Wyndham.  Wyndham sued the McMillans on that basis and a settlement was reached.  At present, Wyndham is challenging the McMillans' breaches of the settlement agreement, both pre- and post- settlement, and also challenging the McMillans' bankruptcy filing on the basis of fraudulent transfers.

121.    Upon information and belief, Salkin and Timeshare Freedom share consumer information, including, without limitation, information on Wyndham Owners, with Burk, TFDB Law, and the rest of the Resort Release ring. Consumers continue to be duped.

### J. FALSE ADVERTISING- SUCKERING THE CONSUMER AND TARGETING WYNDHAM

122.    TPE rings, like the Resort Release ring and the Patriot ring, sucker consumers into retaining their services by engaging in false advertising.  Given the sheer volume of the false advertising it is practically impossible to attach all of the false advertising engaged in by Defendants to this Complaint.  However the following are some examples of the false advertising engaged in by Defendants:

a.    Resort Release runs a banner on the bottom of www.resortrelease.com alleging that various alleged individuals have just retained the services of Resort Release, upon information and belief these statements are false and represent fake reviews by non-existent individuals of Defendants' services;

b.    Resort Release claims its process is "legally binding" and that it has "courthouse recorded results" and that "your timeshare transfer is permanent" (www.resortrelease.com), upon information and belief these statements are false;

c.    offering guaranteed results and 100% money back guarantees; and

d.    running the following advertisements on the Internet:



123.    The foregoing advertisements are either literally false or they are deceptively misleading – there is no third-party basis to exit a timeshare contract, there can be no guaranteed result (other than foreclosure, which consumers could achieve on their own without any third

party), and the advertisements fail to disclose the severe harm that will befall consumers, including, without limitation, Wyndham Owners, if they use Defendants, and that a foreclosure and/or fraudulent transfer will be considered a 'successful exit' by Defendants.  In fact, if engaged in directly by TFDB Law in its own name, the Florida Bar would consider such advertisements to be bar violations that would be considered 'deceptive and inherently misleading' advertising under Rule 4-7.13 of the Rules Regulating the Florida Bar.

124.    In fact, there is no 'actual legal process' that is being followed, such as a lawsuit, administrative proceeding, or other action.  Defendants use a lawyer (TFDB Law, and potentially others) to send a demand letter to timeshare developers, including WVR, WRDC, and SV, which prevents the timeshare developers, including WVR, WRDC, and SV, from communicating directly with the timeshare owner.  The only 'actual legal process' that may occur is the initiation of a foreclosure action by the timeshare developer against the timeshare owner.  Defendants blatantly fail to disclose this fact to consumers.

125.    Moreover, while Defendants (with the exception of TFDB Law) imply that there is some sort of 'qualification' process that consumers must go through, or that Defendants (except TFDB Law) do not accept all consumers into their 'program', the reality is that Defendants accept any consumer who stumbles upon Defendants and is willing to pay the exorbitant up-front fees demanded by Defendants.

126.    Simply, more obvious lies by Defendants.

K. **PERSONAL LIABILITY OF THE INDIVIDUALS RUNNING THESE SHELL ENTITIES AND DIRECTING THE UNLAWFUL CONDUCT**

127.    Because Defendants are nothing but shell companies that act as puppets for the individual defendants, and serve no legitimate or legal purpose (instead being formed solely for

the purpose of engaging in fraudulent and illegal activities), the individual defendants should be held individually liable for all conduct alleged herein.

128.    Eric Cline, Shyla Cline, and Morse are all individually liable for the Resort Release ring as they are the founders, sole officers, sole managers, and sole members of the Resort Release ring entities (with the exception of Help4TSO), as set forth hereinabove.  These entities have no proper purpose for their existence and engage in no legal or proper activities.  Eric Cline, Shyla Cline, and Morse all participate individually and directly in the business operations of the Resort Release ring entities.

129.    Likewise, Howell is the founder, sole officer, and apparently sole shareholder of Help4TSO as set forth hereinabove.  Help4TSO has no proper purpose for their existence and engage in no legal or proper activities.  Howell participates individually and directly in the business operations of Help4TSO.

130.    Finally, Salkin is the direct owner of the <timesharefreedomgroup.com> domain through which Timeshare Freedom directly operates.  Therefore, Slkin is personally liable for Timeshare Freedom's actions as he directly owns and controls the Timeshare Freedom domain name.

131.    These individuals' personal liability is undeniable.

L.    **WYNDHAM FIGHTS BACK – PARTICULAR COUNTS**

**COUNT I**
**Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1) (against all Defendants)**

132.    Wyndham adopts and realleges paragraphs 1 through 131 above as if fully set forth herein.

133.    This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

134.    Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers. The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

135.    The representations described above were commercial speech made by a defendant acting in competition to Wyndham by trying to interfere with Wyndham's business relationships for Defendants' own ill-gotten financial gain, for the purpose of influencing consumers to retain Defendants' services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

136.    Defendants' false or misleading statements either deceived or had the capacity to deceive a substantial segment of the consuming public.

137.    Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain Defendants' services or to cease making payments to Wyndham or utilize the Ovation® Program, which is available to assist Wyndham Owners who may wish to exit their timeshare contracts with Wyndham. Defendants directly lie to the consuming public by ignoring the existence of the Ovation® Program and ignoring the options available to Wyndham Owners, instead telling consumers that Wyndham will do nothing to work with consumers.

138.    Defendants are operating as direct competitors to Wyndham. Because of the nature of the TPE scams, a consumer can either be a customer of Wyndham or a customer of a TPE entity, but not both. This is because TPEs exist solely to induce consumers to breach their timeshare contracts, they have no other purpose. Thus, once a Wyndham Owner enters into an agreement with a TPE, the sole purpose of that agreement is to cause the breach or termination

through other means of that Wyndham Owner's agreement(s) with Wyndham, effectively converting that individual from a Wyndham Customer to a TPE customer.

139.   Wyndham has been or is likely to be injured as a result of Defendants' false and/or misleading statements.

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against Defendants, jointly and severally, for damages, corrective advertising, and disgorgement of Defendants' profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of preliminary and permanent injunctive relief, and for such other and further relief as the Court deems appropriate.

## COUNT II
### Tortious Interference with Contractual Relations (against all Defendants)

140.   Wyndham adopts and realleges paragraphs 1 through 131 above as if fully set forth herein.

141.   This is a cause of action for tortious interference with contractual relations.

142.   Wyndham has contractual relationships with its timeshare owners.

143.   Defendants, by virtue of making misrepresentations to Wyndham Owners regarding their contracts and the existence of the Ovation® Program, and options available to them, have knowledge of these relationships.

144.   As set forth herein, Defendants have intentionally procured the breach of these Wyndham contracts by soliciting Wyndham Owners and persuading them to hire Defendants to help cancel (in reality, breach) their contracts. Upon information and belief, Defendants also procure a breach by telling Wyndham Owners to stop paying their timeshare loans and maintenance fees and/or engaging in fraudulent transfers.

145.     Defendants do not have justification or privilege in procuring the breach of such contractual relations, as Defendants are "a stranger to the business relationship" between Wyndham and its customers.  See *Treco Intern. S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1289 (S.D. Fla. 2010) (quoting *Salit v. Ruden*, 742 So.2d 381, 385 (Fla. 4th DCA 1999)).

146.     As a result of Defendants' intentional conduct, certain of the breaching owners have terminated their contractual relationships with Wyndham before expiration of the terms of those contracts. Some of these breaching owners are current on their maintenance fees and would in certain instances keep their timeshare contracts but for Defendants' wrongful actions.

147.     Defendants' ongoing conduct has caused and, if not permanently enjoined, will continue to cause irreparable harm to Wyndham in the disruption of customer and other contractual relations; therefore, Wyndham does not have an adequate remedy at law.

148.     Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of preliminary and permanent injunctive relief, and for such other and further relief as the Court deems appropriate.

## COUNT III
### Violation of Florida's Deceptive and Unfair Trade Practices Act (against all Defendants)

149.     Wyndham adopts and realleges paragraphs 1 through 131 above as if fully set forth herein.

150.     This is a cause of action for damages and permanent injunctive relief under Section 501.211, Fla. Stat.

151.    Wyndham is a legitimate business enterprise under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

152.    Wyndham's owners and prospective owners are consumers for purposes of FDUTPA.

153.    Defendants are engaged in trade or commerce as those terms are defined by FDUTPA.  Defendants are also engaged in timeshare transfer services as defined in Fla. Stat. § 721.05(52) ("Transfer Interest Services").

154.    Defendants have violated Fla. Stat. § 721.17 by failing to comply with the state requirements for the transfer of interest and resale of transfer agreements pertaining to timeshare entities.

155.    Defendants have offered and executed contracts titled "Deed / Title Transfer Service Contract" with multiple Wyndham customers.

156.    In executing these Deed / Title Transfers, Defendants have never established an escrow account with an escrow agent prior to the agreement as required by Fla. Stat. § 721.17(3)(c)(1).

157.    Defendants are engaged in deceptive and unfair practices, including luring unsuspecting timeshare owners into Defendants under false pretenses and using misrepresentations and high pressure sales tactics to convince Wyndham consumers to pay substantial fees to "cancel" their contracts with Wyndham, when, in many instances, cancellation is available to consumers directly from Wyndham at no cost through the Ovation® Program.

158.    Wyndham is a party aggrieved by Defendants' violation of FDUTPA.

159.    Section 501.211(1), Fla. Stat., "permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to

occur in the future." *Wyndham Vacation Resorts, Inc. v. Timeshare Direct, Inc.*, 123 So.3d 1149, 1152 (Fla. 5th DCA 2012).

160.     Under Section 510.211(1), Fla. Stat., "anyone aggrieved" includes a broader class of complainants than merely consumers; the scope of the injunctive remedy is also greater than the actual damage remedy under § 510.211(2), Fla. Stat. *Id. See also, Kinger v. Weekly World News, Inc.*, 747 F.Supp. 1477, 1480 (S.D.Fla.1990).

161.     As a result of Defendants' actions, Wyndham has been damaged and aggrieved. Wyndham has suffered a loss, including financial loss, damages to its reputation, and loss of goodwill.

162.     Wyndham's losses will increase unless Defendants are permanently enjoined from continuing their deceptive and unfair business practices.

163.     Wyndham will continue to suffer irreparable harm to its reputation and goodwill unless Defendants are permanently enjoined from continuing its deceptive and unfair business practices, and, as a result, Wyndham lacks an adequate remedy at law.

164.     Wyndham is entitled to recover its attorney's fees and costs from Defendants under Sections 501.2105 and 501.211, Fla. Stat.

WHEREFORE, Plaintiffs respectfully request the Court enter preliminary and permanent injunctive relief against all Defendants, award Plaintiffs their costs, and for such other and further relief as the Court deems appropriate.

**COUNT IV**
**Civil Conspiracy (against all Defendants)**

165.     Wyndham adopts and realleges paragraphs 1 through 131 above as if fully set forth herein.

166.     This is a cause of action for civil conspiracy to interfere with existing contractual relations and/or advantageous business relationships and for damages in excess of $75,000.00, exclusive of interest, attorney's fees and costs, and is within this Court's jurisdiction.

167.     Defendants are parties to a civil conspiracy.  Defendants had a common design, each having the intent and knowledge of the others' intent to accomplish by concerted action unlawful purposes and/or lawful purposes by unlawful means.

168.     Defendants conspired to do an unlawful act to cause Plaintiffs harm.  Defendants acted in concert with a common design, scheme, or plan to bring about a desired result and/or accomplish a preconceived plan for financial gain to the detriment of Plaintiffs through unlawful and/or illegal means of interfering with Plaintiffs' business relations with it owners and/or causing its owners to breach their contractual agreements with Plaintiffs.  Defendants committed or engaged in overt acts in furtherance of their unlawful conspiracy to interfere with Plaintiffs business relations or to induce Plaintiffs' customers to breach their contractual agreements.

169.     Defendants conspired to interfere with Plaintiffs' business and contractual relationship with the Wyndham Owners and/or were directed by other Defendants to interfere with Plaintiffs' business and contractual relationship with the Wyndham Owners.

170.     Defendants each performed and/or were directed by other Defendants to perform one or more overt actions in furtherance of their conspiracy as set forth hereinabove.

171.     As a direct and proximate result of Defendants' civil conspiracy, Wyndham Owners have terminated, or have sought to terminate, their contractual relationship with Plaintiffs before the expiration of the terms of those contracts.

172.     Defendants did not have any justification or privilege in procuring the breach of such business relationships. As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

173.     Defendants acted willfully and with malice in taking these actions.

174.     Defendants are jointly and severally liable to Plaintiffs for Damages.

175.     Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs request the Court enter final judgment in their favor and against Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of preliminary and permanent injunctive relief, and for such other and further relief as the Court deems appropriate.

**COUNT V**
**Violation of Florida Timeshare Act (against all Defendants)**

176.     Wyndham adopts and realleges paragraphs 1 through 131 above as if fully set forth herein.

177.     This is a cause of action arising under the Florida Vacation Plan and Timesharing Act, Chapter 721, Florida Statutes.

178.     Defendants are engaged in timeshare interest transfer services as defined in Fla. Stat. § 721.05(52) as they are collectively engaged in offering and providing goods and/or services relating to an offer or agreement to transfer ownership of a consumer resale timeshare interest, or assistance with or a promise of assistance in connection with the transfer of ownership of a consumer resale timeshare interest.

179.     Defendants have violated the Florida Vacation Plan and Timesharing Act, Fla. Stat. § 721.17, by:

a.      failing to include in all agreements with Wyndham Owners the language required by Fla. Stat. § 721.17(3)(b);

b.      failing to maintain and utilize the escrow account required by Fla. Stat. § 721.17(3)(c);

c.      requiring payment from Wyndham Owners immediately upon entering into an agreement with any of the Defendants and not after services have actually been performed, as required by the statute; and

d.      transferring timeshare interests to a transferee that does not have the ability, means, or intent to pay all assessments and taxes associated with the timeshare interest.

180.    Because TFDB Law charges more than $600 for its services, it is not exempt pursuant to Fla. Stat. § 721.17(3)(h)(2).

WHEREFORE, Plaintiffs respectfully request this Court enter final judgment in their favor and against Defendants, jointly and severally, for its actual damages, together with interest thereon, attorneys' fees, and costs, and for such other and further relief as the Court deems appropriate.

## COUNT VI
## Tortious Interference with Current and Prospective Business Relationships
## (against all Defendants)

181.    Wyndham adopts and realleges paragraphs 1 through 131 above as if fully set forth herein.

182.    This is a cause of action for tortious interference with advantageous business relationships and for damages in excess of $75,000.00, exclusive of interest, attorney's fees and costs.

183.     Plaintiffs have advantageous business relationships or prospective business relationships with identifiable third parties, specifically the Wyndham Owners.  Plaintiffs expend considerable time and resources developing and cultivating current and prospective business relationships with its owners.

184.     Defendants have actual, constructive, and/or specific knowledge of the relationships between Wyndham and the Wyndham Owners. The very fact that Plaintiffs have a business relationship with the Wyndham Owners is the basis under which Defendants sought to establish a relationship with the Wyndham Owners.  Indeed, if it were not for the existence of the relationships between Wyndham and the Wyndham Owners, Plaintiffs would have no reason to exist.

185.     Defendants, through various inter-related entities as described hereinabove, have successfully solicited Wyndham Owners and caused them to breach and/or terminate their relationships with Plaintiffs and, specifically, with WVR, WRDC, and/or SV.

186.     As stated above, Defendants have intentionally and without justification interfered with Plaintiffs' relationships by convincing Wyndham Owners to immediately stop making any further payments under their contracts without any legal basis and/or by making frivolous and unsupported allegations against Wyndham.

187.     Defendants have utilized improper and/or illegal means to interfere with Plaintiffs' business relations.

188.     Defendants' actions were done with improper motive and not made in good faith, but rather were made with the knowledge and predominant purpose to injure Plaintiffs or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting

from Defendants' actions and without reasonable grounds for Defendants to believe that their actions were justified and proper.

189.    As a direct and proximate result of Defendants' intentional misconduct, Wyndham Owners have terminated, or have baselessly sought to terminate, their contractual relationship with Plaintiffs and, more specifically, WVR, WRDC, and/or SV, before the expiration of the terms of those contracts.  These terminations, and attempted terminations, also interfere with Wyndham's ability to enter into subsequent transactions with those same Wyndham Owners.

190.    Defendants did not have any justification or privilege in procuring the breach of such business relationships and their interference with Plaintiffs' business is willful and malicious.

191.    Defendants' interferences inference involves deceit, fraud, undue influence, misuse of inside information, sharp business practices, breach of fiduciary relationships, overreaching conduct, violation of ethical rules and/or constitutes unfair competition.

192.    As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

193.    Plaintiffs are entitled to damages against all Defendants jointly and severally.

194.    Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully requests this Court enter final judgment in their favor and against Defendants, jointly and severally, for their actual damages, together with interest thereon, punitive damages, attorneys' fees, and costs, and for such other and further relief as the Court deems appropriate.

## COUNT VII
## Request for Injunctive Relief (against all Defendants)

195.     Wyndham adopts and realleges paragraphs 1 through 194 above as if fully set forth herein.

196.     This is a cause of action for temporary and permanent injunctive relief.

197.     Defendants' solicitation of Wyndham Owners using false and misleading advertising and their subsequent instruction to immediately terminate the Wyndham Owners' contracts with Plaintiffs is harming Plaintiffs and constitutes tortious interference with Plaintiffs' existing contractual and advantageous business relationships.

198.     Defendants have engaged, continue to engage, and/or intend to further engage in the conduct described above.

199.     Defendants' actions present an immediate threat of irreparable harm to Plaintiffs, and Plaintiffs will suffer irreparable harm if Defendants, and their agents, affiliated companies or entities, representatives and employees, are not enjoined from this conduct.

200.     The threat of irreparable harm is continuing because Defendants currently engage in an ongoing business whereby they solicit Wyndham Owners using the false and misleading advertising outlined above; and then convince the Wyndham Owners to immediately stop paying all mortgage, maintenance, and tax payments associated with their timeshares, regardless of whether any valid legal basis exists for the cancellation.  These defaults result in loss of good will and damages to the customer relationship with other Wyndham Owners that are not in default and enjoying their Wyndham Contracts.  Non-Defaulting Wyndham Owners will be forced to incur higher fees/payments as a result of the deficiencies caused by Defendants' ongoing actions.

201.    Plaintiffs have no adequate remedy at law as damages will not address the harm Plaintiffs will suffer if Defendants are permitted to continue with this activity. Plaintiffs will have imminently thousands of dollars in delinquent mortgage, maintenance, and tax payments owed to them and will be forced to expend monies foreclosing on the timeshares to recoup these monies to no end as Defendants refuse to cease and desist from this tortious conduct.

202.    There is a substantial likelihood that Plaintiffs will prevail on the merits of their claims against Defendants.

203.    The injury and potential harm caused by Defendants' intentional inference with Plaintiffs' advantageous business relationships outweigh the harm, if any, that an injunction would cause to Defendants.

204.    The issuance of the requested injunction will serve the public interest by protecting Plaintiffs' legitimate business interests and their timeshare owners, and by restraining the disruptive and tortious actions committed by Defendants.

WHEREFORE, Plaintiffs demand a temporary and permanent injunction be entered against Defendants and their agents, representatives, employees, affiliates, and any others acting in concert or participating with Defendants and prohibiting Defendants from: (1) publishing false and misleading misrepresentations on their website or in any other electronic or print media or materials regarding Plaintiffs' owners' cancellation of their timeshare interest without any legal basis; (2) contacting and/or otherwise interfering with Plaintiffs' contractual and business relationships with their owners; and (3) taking or making any distributions, expenditures, or transfers, other than in the usual course of business, from any entity that Defendants directly, indirectly, or effectively control, including, but not limited to, the named Defendant entities, or any such entity that has received any funds from any of the Defendants.  Plaintiffs further seek

an award of as well their costs and attorneys' fees and for all other relief this Court deems just and proper.

Dated: August 9, 2018

                                                 */s/ Alfred J. Bennington, Jr.*

**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile:  (407) 849-7255

and

**DANIEL J. BARSKY, ESQ.**
Florida Bar No. 25713
dbarsky@shutts.com
**SHUTTS & BOWEN LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, Florida 33131
Telephone: (561) 650-8518
Facsimile:  (561) 822-5527

*Attorneys for Plaintiffs*

ORLDOCS 16310902 6